UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

BRAD M. COLLIER,          )
                               )
            *Plaintiff,*     )
                               )
        v.              )     CAUSE NO. 4:20-CV-253 RLM-KMB
                               )
CITY OF NEW ALBANY,     )
                               )
           *Defendant*   )

<u>OPINION AND ORDER</u>

Brad Collier worked for the City of New Albany for over 20 years in the New Albany Fire Department. He sued the City of Albany, bringing claims under the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and the Family and Medical Leave Act. The City of New Albany moves for summary judgment on all claims. [Doc. 46]. For reasons explained in this opinion, the court grants the City's motion for summary judgment in full.

BACKGROUND

The court presents the record in the light most favorable to Mr. Collier, the nonmoving party, at summary judgment. <u>Eaton v. J.H. Findorff & Son, Inc.</u>, 1 F.4th 508, 511 (7th Cir. 2021).

Brad Collier joined the City of New Albany Fire Department as a firefighter in 1999. Mr. Collier moved up to the rank of sergeant in 2005 and captain in

2012. Mr. Collier brought this lawsuit against New Albany in December 2020, bringing claims for discrimination and retaliation under the Americans with Disabilities Act, race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, age discrimination and retaliation under the Age Discrimination in Employment Act, and retaliation under the Family and Medical Leave Act. He then retired in May 2022, after over 20 years of employment with the New Albany Fire Department.

*2015 Incident*

Mr. Collier connects some of his claims to an incident in 2015 involving another firefighter, Sergeant Tony Habermel.

In 2015, one of Mr. Collier's colleagues, Captain Jodie Wilson, thought Sergeant Habermel was bullying Captain Wilson's crew. His crew consisted of two Black firefighters and two white firefighters. Captain Wilson secretly recorded a conversation he had with Sergeant Habermel in which Sergeant Habermel told Captain Wilson he had to stop doing all the work for his crew and "stop being the house [N-word]."

When Deputy Chief of Personnel Brian Gadd caught wind of the gossip, he ordered Captain Wilson to turn over the recording. Captain Wilson first refused but eventually gave the recording to Deputy Chief Gadd. Deputy Chief Gadd warned Sergeant Habermel not to use the slur again.

A few days later, Sergeant Habermel approached Mr. Collier several times asking whether he was on Captain Wilson's team. Mr. Collier is Black and felt

Sergeant Habermel was harassing him and creating a hostile work environment. Mr. Collier reported the incident to Deputy Chief Gadd and two other superiors by email, explaining that it "needed to be addressed ASAP."[1] Mr. Collier filed a formal complaint and several days later Deputy Chief Gadd discussed the complaint with Mr. Collier. Deputy Chief Gadd asked if Mr. Collier was willing to sit down with Sergeant Habermel to discuss the incident. He said he would be willing, but they never met to discuss the matter, and from then on Mr. Collier avoided unnecessary interactions with Sergeant Habermel. They've had no meaningful contact since then.

## Health Issues

Mr. Collier bases some of his claims on incidents in 2018 and 2019 involving a heart attack and a hernia surgery.

Mr. Collier had a heart attack in May 2018. He started to take medication for his heart issues and started experiencing night sweats and cramping at work. He didn't seek an accommodation, though he was offered a "light duty" job with equal pay and benefits. He declined the light duty job because he viewed it as merely sitting at a desk and more like punishment than an accommodation.

---

[1]     Mr. Collier alleges that Sergeant Habermel "continued to make discriminatory remarks regarding African Americans that were recorded by Jodie Wilson." [Doc. 51 at 10]. Mr. Collier cites to his own deposition transcript to support this contention, but the lines he cites either don't appear in the record or are redacted. The court can't infer that Sergeant Habermel continued to make discriminatory remarks. *See* Fed. R. Civ. P. 56(c)(1)(A).

Later in 2019, Mr. Collier was on medical leave for cramps and night sweats. While on leave, he called the fire department headquarters and spoke to Theresa Hammond, the fire department's secretary. He explained that he needed to delay his return to work because he was to have surgery for a hernia. Ms. Hammond told Deputy Chief Baylor of the request who in turn relayed the request to Deputy Chief Gadd, who approved the request.

When Mr. Collier returned to work in June 2019, Captain Wilson told him he was sorry to hear that about his hernia surgery. Another firefighter was teaching a training class and told the class that Mr. Collier would be on extended leave because he was having hernia surgery. Mr. Collier, upset that his private medical information was circulating, complained to Deputy Chief Gadd. Deputy Chief Gadd reported the incident to the city's human resources department, spoke to Ms. Hammond about the incident, and explained to Mr. Collier that Ms. Hammond speaks loudly and someone probably overheard their conversation about the surgery.

In late June, Mr. Collier left for vacation. His vacation lasted until his hernia surgery in late July, and then he was on medical leave recovering from surgery until September 6. He took additional medical leave under the Family and Medical Leave Act from September 17 to October 3.

Battalion Chief Sparks thought Mr. Collier was set to return to work on September 28 because scheduling documents didn't reflect Mr. Collier's extended leave. Battalion Chief Sparks scheduled Mr. Collier to work while he was still on leave. Mr. Collier didn't appear at work and didn't answer phone

calls, so a few of Mr. Collier's colleagues went to his house to check on him. Battalion Chief Sparks eventually told Mr. Collier he was considered absent without leave. Mr. Collier was written up for being AWOL, but in October he presented a doctor's note to Deputy Chief Gadd and showed an email the human resources department had sent Deputy Chief Gadd describing Mr. Collier's extended medical leave. Deputy Chief Gadd apologized for missing the email and tore up the document marking Mr. Collier as AWOL.

Later that month, Mr. Collier responded to a fire and became overexerted. Mr. Collier suspected his heart attack caused his symptoms. Medical staff administered oxygen and checked Mr. Collier's vital signs. Battalion Chief Bowyer told Mr. Collier to complete a casualty report about the incident, but Mr. Collier refused, explaining that a white firefighter recently was overexerted but wasn't forced to complete a casualty report.

Five days later, Deputy Chief Gadd and Battalion Chief Bowyer visited Mr. Collier to check in on his wellbeing. The conversation turned to Mr. Collier's perception that he wasn't getting equal treatment for his heart attack; he said he was upset that Joel Baylor had a heart attack and then had the deputy chief of operations position created for him as an accommodation. Meanwhile, Mr. Collier had a heart attack followed by more of the same work on the front line. Mr. Collier again brought up his "HIPAA complaint" regarding office chatter about his hernia surgery. Deputy Chief Gadd reiterated that Ms. Hammond talks loudly, and someone probably overheard her.

*The Doe Incident*

Mr. Collier connects some of his claims to an incident involving another firefighter in 2019.

Mr. Collier was captain of a fire crew in November 2019. His crew consisted of Sergeant Madell Peters, Nate Sullivan, and "John Doe."[2] Mr. Doe was on medical leave in early November.

On the morning of November 1, Mr. Collier was doing chores at the firehouse. Mr. Sullivan approached Mr. Collier and told him that John Doe wasn't "the guy you think he is." Mr. Sullivan showed Mr. Collier a video of Mr. Doe having sex with two other adult men and suggested that if Mr. Doe would have sex with men, he was capable of "messing around with" children. Mr. Sullivan then showed a report from Child Protective Services involving Mr. Doe, suggesting he might be a child abuser.

Mr. Peters then entered the room and viewed the video. The three men called Battalion Chief Bowyer to the station and saved the materials to a thumb drive. After Chief Bowyer arrived, they shared the information with him, and he summoned Deputy Chief Gadd to the station. They described the information to Deputy Chief Gadd, who in turn called Fire Chief Matt Juliot and the New Albany Police Chief to the station.

When the fire chief and police chief arrived, the three men admitted the flash drive contained no material involving children but demanded that Mr. Doe

---

[2]     The court follows the parties' lead and refers to this coworker as John Doe for the sake of his privacy.

be disciplined and that they not work with him anymore. The police chief checked into the Child Protective Services allegations and learned that they had been investigated and deemed unfounded. Battalion Chief Bowyer explained that Mr. Doe was "macho" and might kill himself if this information got out, though Fire Chief Juliot understand the statement to be more hyperbole than literal.

The police chief ordered the men to destroy the thumb drive and not to discuss the materials. Chief Juliot and Deputy Chief Gadd reiterated that the command was a formal order. Deputy Chief Gadd called the station later that day to reiterate the order not to discuss the material.

Mr. Collier and his crew continued to talk about John Doe. Mr. Collier told some colleagues on another crew about the incident. He described in some detail the video of Mr. Doe being intimate with two men and implied there was material relating to minors.

Around that same time, Mr. Collier called Battalion Chief Bowyer to discuss "safety concerns" about Mr. Doe. He told Battalion Chief Bowyer that Mr. Doe had peed the bed before, might have stolen and then returned exercise equipment from the fire station, seemed to have anabolic steroids sitting in the station, and that colleagues said Mr. Doe would "flare up" when out drinking with colleagues. He demanded a meeting to address those concerns.

On November 7, Mr. Collier, Mr. Peters, and Mr. Sullivan met with Deputy Chief Gadd, Battalion Chief Bowyer, an HR representative, and the city controller. Mr. Collier and the other two firefighters insisted that Mr. Doe be disciplined for what he did and that they could no longer work with him because

7

they feared he'd try to get into bed or into the shower with them. Mr. Collier then complained for the first time about a comment Mr. Doe made seven or eight months earlier. Mr. Collier overheard Mr. Doe trying to convince a friend to apply for an open position on Mr. Collier's crew. Mr. Doe told the friend he was "outnumbered two to one." Mr. Collier thought this referred to race because there were two Black men on the crew and one white man.

New Albany's human resources officer recommended that the three men be terminated for violating Mr. Doe's rights and privacy by bringing his private sexual matters into the work environment. Chief Juliot and Deputy Chief Gadd decided instead to recommend that Mr. Sullivan be terminated, Mr. Collier be demoted and placed on unpaid suspension for five days, and Mr. Peters be placed on unpaid suspension for 1.5 days. Mr. Sullivan's discipline was to be the most severe because he introduced the video and Child Protective Services report to the workplace, and because he implied there was child sex abuse material when he knew there wasn't. Mr. Collier's discipline was to be more severe than Mr. Peters's because Mr. Collier was of a higher rank so was held to higher standards and was expected to lead by example.

Mr. Peters accepted his punishment and immediately served his 1.5-day unpaid suspension. He was later promoted to captain.

Mr. Sullivan challenged his proposed termination and ended up serving a ten-day unpaid suspension. Although suspensions usually didn't last more than five days, Mr. Sullivan was at the lowest rank so couldn't be demoted. His suspension was lengthened instead.

Mr. Collier first admitted that he violated rules and regulations by disobeying direct orders and agreed that as a captain, he was held to a higher standard than many other firefighters. Deputy Chief Gadd and Chief Juliot passed on the recommendations to the Board of Works, which had authority to impose discipline. Once Mr. Collier received his notice of discipline, he refused to sign the form and demanded a hearing in front of the Board of Works. Chief Juliot and Deputy Chief Gadd prepared witness statements before the hearing and reviewed the statements with Mr. Collier. Rather than proceeding with the Board of Works hearing or a union grievance, Mr. Collier proposed he be suspended and demoted. Mr. Collier agreed in writing on January 10, 2020, to a demotion from captain to sergeant and a five-day unpaid suspension. He also agreed to float among positions and assignments until a permanent position became available.

*EEOC Charge and Retirement*

Mr. Collier filed a charge with the Equal Employment Opportunity Commission on June 10, 2020, alleging race and disability discrimination and retaliation. The charge based his race discrimination and retaliation claims on the incident with Mr. Doe and the disparate punishment Mr. Collier received. The charge based his disability claims on the "HIPAA violation," New Albany's supposed failure to investigate, and retaliation for taking medical leave.

Mr. Collier amended his EEOC charge on September 18, 2020. The amended charge alleged discrimination from October 3, 2019, to March 12,

2020. Mr. Collier additionally alleged that he was forced to work shifts outside of his job classification and wasn't given a new non-captain's helmet after his demotion. He further alleged that two white captains once got in a physical altercation and weren't disciplined. He also added an age discrimination charge, alleging that firefighters under the age of 40 were given more favorable shifts while he was forced to work shift assignments outside his job classification. Mr. Collier received a right-to-sue letter.

Mr. Collier retired on May 4, 2022, receiving the same retirement benefits that any New Albany firefighter receives.[3]

STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A court accepts the non-movant's evidence as true and draw all inferences in his favor. Id. at 255. Nevertheless, the nonmoving party is not entitled to "[i]nferences that are supported by only speculation or conjecture." Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008). The existence of an alleged

---

[3]     Mr. Collier at one point claims he was "made to retire approximately 20 years earlier than was considered normal." [Doc. 51 at 12]. Mr. Collier cites to a redacted deposition transcript. He provides no other evidence to support that he was forced to retire early.

factual dispute, by itself, won't defeat a summary judgment motion; "instead the nonmovant must present definite, competent evidence in rebuttal," <u>Parent v. Home Depot U.S.A., Inc.</u>, 694 F.3d 919, 922 (7th Cir. 2012), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." <u>Hemsworth v. Quotesmith.com, Inc.</u>, 476 F.3d 487, 490 (7th Cir. 2007); *see also* Fed. R. Civ. P. 56(e)(2).

DISCUSSION

New Albany moves for summary judgment on each of Mr. Collier's claims.

*ADA Discrimination (Count I)*

Mr. Collier claims New Albany discriminated against him because of a disability in violation of the Americans with Disabilities Act. The ADA prohibits covered employers from discriminating against any qualified individual because of the individual's disability. 42 U.S.C. § 12112(a). An employer discriminates against an employer by taking an adverse employment against the employee because of the employee's disability or by failing to reasonably accommodate the employee's disability. <u>Stevens v. Ill. Dep't of Transp.</u>, 210 F.3d 732, 736 (7th Cir. 2000). Mr. Collier seems to claim both forms of discrimination. New Albany argues it's entitled to summary judgment on either type of claim.

To prove an employer's failure to accommodate, a plaintiff must show: (1) the plaintiff was a qualified individual with a disability; (2) the employer knew of the disability; and (3) the employer failed to reasonably accommodate the

11

disability. <u>Cloe v. City of Indianapolis</u>, 712 F.3d 1171, 1176 (7th Cir. 2013). An employer ordinarily doesn't know that an employee needs an accommodation until the employee asks for one, so "the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches." <u>Fleishman v. Cont'l Cas. Co.</u>, 698 F.3d 598, 608 (7th Cir. 2012) (quoting <u>Jovanovic v. Emerson Elec. Co.</u>, 201 F.3d 894, 899 (7th Cir. 2000)). Once the employer knows that the employee needs an accommodation, the employer gets to choose the accommodation. <u>EEOC v. Sears, Roebuck & Co.</u>, 417 F.3d 789, 802 (7th Cir. 2005). The accommodation must nevertheless be effective, and the employer must engage with the employee in an interactive process to find a reasonable accommodation. <u>Id.</u> at 802–804. If the interactive process breaks down, the party responsible for the breakdown bears responsibility for any failure to accommodate. <u>Cloe v. City of Indianapolis</u>, 712 F.3d at 1178.

New Albany argues that Mr. Collier's ADA discrimination claim can't proceed on a failure-to-accommodate theory. It argues that Mr. Collier never requested an accommodation for his heart attack, New Albany didn't know Mr. Collier needed an accommodation, and New Albany nonetheless offered a reasonable accommodation, which Mr. Collier rejected.

Mr. Collier responds that New Albany's treatment of Joel Baylor shows a failure to accommodate. Joel Baylor had a heart attack and was later promoted to the new position of deputy chief of operations. Mr. Collier argues that New Albany created a new position with less physically taxing duties to accommodate Mr. Baylor's heart attack but made Mr. Collier continue with a frontline position.

12

He contrasts Mr. Baylor's promotion with his own eventual suspension and demotion.

New Albany disputes that Deputy Chief Baylor's promotion was an accommodation. It cites testimony that New Albany created the position for Mr. Baylor because he was already doing several tasks of a deputy chief and already received the same pay as a deputy chief. New Albany didn't create the position until about a year after Mr. Baylor's heart attack. According to New Albany, this all shows that creating the position for Mr. Baylor wasn't a reasonable accommodation at all.

New Albany's first argument — that it didn't know Mr. Collier needed an accommodation — appears to fall within the standard rule that a plaintiff must request an accommodation before liability under the ADA attaches. <u>Fleishman v. Cont'l Cas. Co.</u>, 698 F.3d at 608. But New Albany did offer Mr. Collier light duty, and viewed in the light most favorable to Mr. Collier, the offer could show that New Albany knew Mr. Collier was disabled and needed an accommodation.

Even so, Mr. Collier hasn't created a genuine issue as to any failure to provide a reasonable accommodation. An employer must offer a reasonable accommodation and that accommodation must be effective, but an accommodation need not be of the employee's choosing. <u>EEOC v. Sears, Roebuck & Co.</u>, 417 F.3d at 802. Both the employee and the employer must engage in the interactive process to find a reasonable accommodation, and whoever frustrates that process bears responsibility for not accommodating the employee's disability. <u>Cloe v. City of Indianapolis</u>, 712 F.3d at 1176, 1178. New Albany has

shown that it offered Mr. Collier a light-duty position and that Mr. Collier rejected that offer without further discussion. Mr. Collier presented no evidence that he made a counteroffer, explained what a more reasonable accommodation might entail, or otherwise engaged in the interactive process, so the undisputed evidence shows that he caused the interactive process's breakdown and bears responsibility. Id. at 1178.

Mr. Collier's comparison to Mr. Baylor's promotion doesn't change that conclusion. Mr. Collier only evidence that Mr. Baylor's promotion was a disability accommodation is his own speculation. He doesn't create a genuine dispute as to whether Mr. Baylor received a more favorable accommodation. But even if he did, proving that Mr. Collier was treated differently than another disabled employee doesn't show that Mr. Collier was discriminated against because of disability. It might suggest New Albany could provide better accommodations, but that is of no issue when there's no dispute that Mr. Collier bears responsibility for frustrating the interactive process.

Next, New Albany argues that Mr. Collier has no ADA discrimination claim based on an adverse employment action. A plaintiff proves disability discrimination by showing that: (1) he is disabled; (2) he is qualified to perform the essential functions of a job with or without reasonable accommodations; (3) he suffered an adverse employment action; and (4) his disability caused the adverse employment action. Kurtzhals v. Cnty. of Dunn, 969 F.3d 725, 728 (7th Cir. 2020). New Albany assumes Mr. Collier's claim arises from his suspension and demotion. New Albany argues that the decision makers didn't know of his

disability and that too much time passed (about a year and a half) between Mr. Collier's heart attack and his suspension and demotion to suggest causation.

Mr. Collier seems to concede that the suspension and demotion weren't discrimination because of his disability and focuses solely on the casualty report incident. He claims he was asked to complete a casualty report after he was overexerted because of his heart attack, and that a white colleague wasn't forced to complete the report.

The casualty report incident wasn't an adverse employment action, so it can't support an ADA disability discrimination claim. An adverse employment action must be more than trivial and must affect compensation, benefits, or other financial terms of employment. Id. at 729. An employer's action isn't materially adverse simply because it makes an employee unhappy. Id. Mr. Collier points to the casualty report as an adverse employment action yet doesn't dispute New Albany's evidence that casualty reports were only for worker's compensation purposes and served no disciplinary purpose. No reasonable factfinder could find that asking Mr. Collier to complete a casualty report after he suffered overexertion because of a heart attack was disability discrimination, even assuming white colleagues weren't asked to do so. Treating white colleagues differently might show race discrimination; it doesn't show disability discrimination.

Mr. Collier hasn't created a genuine issue as to whether New Albany failed to provide a reasonable accommodation nor as to whether New Albany took an

adverse employment action against him because of his disability. New Albany is entitled to summary judgment on Mr. Collier's ADA discrimination claim.

*ADA Retaliation (Count II)*

Mr. Collier claims New Albany retaliated against him in violation of the Americans with Disabilities Act. The ADA prohibits employers from retaliating against employees who oppose any action that's unlawful under the ADA. 42 U.S.C. § 12203(a). A plaintiff proves ADA retaliation under the "direct method" by showing that: (1) the plaintiff engaged in activity protected by the ADA; (2) the plaintiff suffered an adverse employment action; and (3) the protected activity caused the adverse employment action. Tomanovich v. City of Indianapolis, 457 F.3d 656, 662–663 (2006). A plaintiff proves ADA retaliation under the "indirect method" by showing that: (1) the plaintiff engaged in activity protected by the ADA; (2) the plaintiff met the employer's legitimate expectations; (3) the plaintiff suffered an adverse employment action; and (4) the plaintiff was treated less favorably than a similarly situated employee who didn't engage in protected activity. Id. If the plaintiff makes that prima facie case, the burden shifts to the employer to provide evidence of a legitimate, non-discriminatory reason for the action. Id. If the employer meets that burden, the burden shifts back to the plaintiff to provide evidence that the given reason was pretextual. Id.

Mr. Collier contends that New Albany retaliated against him "by refusing to investigate his [Health Insurance Portability and Accountability Act] complaint following the improper release of [his] sensitive, medical information." [Doc. 51

16

at 17]. The "HIPAA complaint" refers to the complaint he made to Deputy Chief Gadd when colleagues discussed his hernia surgery. He claims that New Albany retaliated against him for raising this complaint by refusing to investigate the "HIPAA claim." He contends that the racial discrimination he endured bolsters his ADA retaliation claim.

New Albany asserts that this isn't enough to show retaliation. It argues that voicing displeasure with a "HIPAA violation" and coworker gossip about a medical condition isn't protected activity under the ADA. New Albany also contests whether Mr. Collier was treated adversely, arguing that it investigated Mr. Collier's complaint and that failure to investigate a complaint wouldn't be an adverse employment action even if it did occur.

New Albany is right on both arguments and is entitled to summary judgment on Mr. Collier's ADA retaliation claim. Mr. Collier presents his entire claim and the evidence supporting that claim as having to do with HIPAA. HIPPA doesn't confer a private right of action, Stewart v. Parkview Hosp., 940 F.3d 1013, 1015 (7th Cir. 2019), and Mr. Collier doesn't explain how alleging a HIPAA violation amounts to opposing activity that's made unlawful by the ADA.

Nor is there a genuine dispute as to an adverse employment action. According to Mr. Collier's own deposition, Deputy Chief Gadd told Mr. Collier that he'd investigated the incident and concluded that the fire department secretary speaks loudly and was likely overheard by a firefighter working near her. Mr. Collier's only evidence to the contrary is his own dissatisfaction with Deputy Chief Gadd's explanation. For instance, he said in his deposition that

17

Mr. Gadd just "just threw an answer out there, didn't tell me how the investigation went, what he did or anything." [Doc. 48-20 at 23]. An adverse employment action for purposes of retaliation must be serious enough that it would dissuade a reasonable employee from engaging in protected activity. Freelain v. Vill. of Oak Park, 888 F.3d 895, 901–902 (7th Cir. 2018). But the action is judged objectively, not according to the plaintiff's subjective feelings. Id. Mr. Collier doesn't dispute that an investigation happened and to the extent he was unhappy with the quality of investigation, he doesn't explain how his subjective dissatisfaction or any other evidence shows that the quality of Deputy Chief Gadd's investigation would deter a reasonable employee from engaging in protected activity.

New Albany has shown there's no genuine issue as to whether Mr. Collier engaged in ADA-protected activity and no genuine issue as to whether New Albany treated Mr. Collier adversely because of any ADA-protected activity. New Albany is entitled to summary judgment on Mr. Collier's ADA retaliation claim.

*Title VII Race Discrimination (Count III)*

Mr. Collier claims that New Albany discriminated against him because of his race. Title VII prohibits discrimination because of an employee's race. 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment, a plaintiff must present evidence that would allow a reasonable factfinder to conclude that the plaintiff's race caused an adverse employment action. Khungar v. Access Cmty. Health Network, 985 F.3d 565, 573 (7th Cir. 2021) (citing Ortiz v. Werner Enters., Inc.,

18

834 F.3d 760, 765 (7th Cir. 2016)). A plaintiff can use the McDonnell Douglas burden-shifting framework to organize evidence of discrimination or can merely show that the totality of the evidence would allow a reasonable factfinder to find discrimination. Purtue v. Wis. Dep't of Corr., 963 F.3d 598, 601–602 (7th Cir. 2020) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Under the McDonnell Douglas framework, a plaintiff makes a prima facie case of discrimination by presenting evidence that: (1) the plaintiff is a member of a protected class; (2) the plaintiff performed his job to his employer's expectations; (3) the plaintiff suffered an adverse employment action; and (4) one or more similarly situated persons outside the protected class were treated better. Skiba v. Ill. Cent. R.R. Co., 884 F.3d 708, 720 (7th Cir. 2018). Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for the employment action. Id. If the employer does so, the burden shifts back to the employee to show that the employer's reason was pretextual. Id. A court takes consideration of the evidence as a whole to determine whether a reasonable factfinder could find that the plaintiff's race caused the adverse employment action. Ortiz v. Werner Enters., Inc., 834 F.3d at 765.

New Albany concedes the first and third prongs of the McDonnell Douglas prima facie case: Mr. Collier's race makes him a member of a protected class and his demotion and suspension following the incidents with the Doe coworker were adverse employment actions. But New Albany insists Mr. Collier wasn't performing to work expectations and that he wasn't treated worse than any

similarly situated coworkers who weren't Black, so he hasn't established the second and fourth prongs of a prima facie case. New Albany argues that Mr. Collier's work performance also shows that New Albany had a legitimate, nondiscriminatory purpose for its actions, so it's entitled to summary judgment even if Mr. Collier establishes a prima facie case.

The questions of an employer's legitimate nondiscriminatory reasons and pretexts arise only if the plaintiff establishes a prima facie case of employment, so courts typically address the prima facie case first. Widmar v. Sun Chem. Corp., 772 F.3d 457, 463 (7th Cir. 2014). But when the employer cites as its legitimate nondiscriminatory reason the plaintiff's failure to meet expectations, the second requirement of the prima facie case and the question of pretext overlap. Id. So, "it is therefore simpler to run through that analysis only once." Simmons v. Chi. Bd. of Educ., 289 F.3d 488, 492 (7th Cir. 2002). Accordingly, the court first considers Mr. Collier's work performance.

New Albany agrees that Mr. Collier had historically met expectations, but insists that he didn't meet expectations around the Doe incident. New Albany contends that Mr. Collier violated fire department rules and regulations by continuing to discuss the Doe incident with others despite being ordered not to do so. New Albany cites its disciplinary notice to Mr. Collier, which explained the violations and cited to department rules against disobeying orders, acting in a manner unbecoming of a firefighter, and disseminating false reports about others. New Albany uses Deputy Chief Gadd and Chief Juliot's testimony to show that Mr. Collier was held to a higher standard and should have led by example

20

rather than aggravating the situation. Mr. Collier conceded the same points in his deposition, testifying that department practice was to treat captains' violations as more serious than firefighters' violations. According to New Albany, Mr. Collier's conduct around the Doe defeats the prima facie case and shows a legitimate nondiscriminatory reason for its actions.

Mr. Collier doesn't dispute that the performed below standards but argues that New Albany only found his performance lacking after he complained about race discrimination. Mr. Collier's argument isn't entirely specific but refers to "comments from other firefighters that insinuated the only reason he had been promoted was because he was African American." [Doc. 51 at 14]. He connects colleagues' accusations that Mr. Collier was appointed because he was Black to Tony Habermel's use of a slur in 2015. Mr. Collier also alleges he was demoted for reporting a racially derogatory comment that had been made in 2019. [Doc. 51 at 9]. This seems to refer to his meeting where he brought up Mr. Doe's "two to one" comments, which Mr. Collier understood as referring to race.

None of this would allow a reasonable factfinder to find race discrimination. Mr. Collier doesn't dispute that he fell below New Albany's legitimate expectations in dealing with Mr. Doe. His explanation seems to be that New Albany retaliated by saying his performance was below expectations after he complained about racist incidents. That would support a retaliation claim, not a race discrimination claim. Mr. Collier's arguments and evidence don't show pretext or otherwise explain how a reasonable factfinder could find discrimination, with or without the <u>McDonnell Douglass</u> framework.

21

New Albany is entitled to summary judgment on Mr. Collier's Title VII discrimination claim.

*Title VII Race Retaliation (Count IV)*

Mr. Collier alleges that New Albany retaliated against him for opposing race discrimination, in violation of Title VII of the Civil Rights Act of 1964. New Albany moves for summary judgment on the claim.

Title VII prohibits employers from retaliating against an employee because the employee "has opposed any practice made an unlawful employment practice" by Title VII or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a); *see* Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008). A plaintiff can use the direct method or indirect method of proof to show Title VII retaliation. The direct method requires proof that the plaintiff engaged in protected activity, that he suffered an adverse employment action, and that the protected activity caused the action. Lewis v. Wilkie, 909 F.3d 858, 866 (7th Cir. 2018). The indirect method requires proof that the plaintiff engaged in protected activity, that he met his employer's legitimate expectations, that he suffered an adverse employment action, and that similarly situated coworkers who didn't engage in protected activity were treated better. Boston v. U.S. Steel Corp., 816 F.3d 455, 464 (7th Cir. 2016). The burden then shifts to the employer to provide a legitimate nondiscriminatory reason, which the plaintiff can overcome by showing that the given reason is pretextual. Id. Ultimately, Mr. Collier's claim

survives summary judgment if "a reasonable juror could conclude that there was a causal link between the protected activity . . . and the adverse action." Rozumalski v. W.F. Baird & Assocs., 937 F.3d 919, 924 (7th Cir. 2019).

New Albany makes several arguments as to Mr. Collier's Title VII retaliation claim. First, New Albany argues that the only undisputed protected activity — Mr. Collier's EEOC charges — wasn't followed by any adverse action. New Albany explains that any of the other race-based complaints might have preceded employment actions, but none that give rise to a retaliation claim. For instance, Mr. Collier complained about Mr. Habermel's behavior after his "house [N-word]" comments, but those complaints were about harassment generally, not about harassment based on race. Mr. Collier complained that Mr. Baylor got a better accommodation for his heart attack, but Mr. Baylor and Mr. Collier's heart attacks were over a year apart. Plus, New Albany asserts that Mr. Baylor knew another white officer had a heart attack yet wasn't promoted like Mr. Baylor, so the complaint wasn't based on a good-faith and reasonable belief that he was opposing discrimination. See O'Leary v. Accretive Health, Inc., 657 F.3d 625, 632 (7th Cir. 2011) (plaintiff must have both an honest and a reasonable belief that he is opposing an unlawful practice). Lastly, Mr. Collier complained about Mr. Doe's "two to one" comment but suggested in his own deposition that he knew Mr. Doe's intent was to get his friend on the same crew, so the complaint wasn't based on a good-faith and reasonable belief about racism.

Second, New Albany argues that Mr. Collier's claim fails under the indirect method of proof. The indirect method requires evidence that the plaintiff was

performing to expectations and that other similarly situated coworkers who didn't engage in protected activity were treated better. Boston v. U.S. Steel Corp., 816 F.3d at 464. New Albany asserts that there's no genuine dispute that Mr. Collier was performing below expectations around the Doe incident and that no similarly situated employees were treated better. According to New Albany, Mr. Sullivan and Mr. Peters aren't similarly situated because their different ranks make them materially different. *See* Patterson v. Ind. Newspapers, Inc., 589 F.3d 357, 365–366 (7th Cir. 2009).

Third and finally, New Albany argues Mr. Collier's claim fails under the direct method of proof because he can't show a causal connection between protected activity and discipline. Only Deputy Chief Gadd received Mr. Collier's complaints about Mr. Doe's racial comments, yet other managers ultimately decided to accept the proposed punishment. Mr. Collier complained about Mr. Baylor's better treatment, too, but those complaints were too far in time from Mr. Collier's suspension and demotion to raise an inference of causation and the intervening events with Mr. Doe further negate any causal inference.

Mr. Collier doesn't fully respond to New Albany's arguments. He asserts he engaged in Title VII-protected activity by complaining about racial remarks that colleagues made. He connects this to his suspension and demotion by pointing out that New Albany only found his performance lacking after he raised those concerns. He cites an incident when two white firefighters got in a physical fight and were disciplined less harshly than him and points to the other firefighters in the Doe incident who received more lenient punishment.

No reasonable factfinder could find that Mr. Collier's complaints about racial comments caused any adverse employment action. First, Mr. Collier doesn't respond to New Albany's arguments about the direct and indirect methods, so appears to waive any contrary argument. His argument fares no better by itself. Mr. Collier argues that his complaint about Mr. Doe caused his performance reviews to decline, which then led to his demotion and suspension. The argument rests solely on suspicious timing and completely ignores the context of the Doe incident. Mr. Collier doesn't dispute that his complaint came in the midst of his own disobeying direct orders and violating department rules and regulations. He presents no evidence other than timing to suggest retaliatory motive. A reasonable factfinder couldn't view Mr. Collier's complaint as causing an adverse employment action when he doesn't dispute New Albany's evidence that his conduct with Mr. Doe caused his demotion and suspension

Mr. Collier hasn't created a genuine issue that any of his Title VII protected activity caused New Albany to take adverse action against him, so New Albany is entitled to summary judgment on Mr. Collier's Title VII race retaliation claim.

*Age Discrimination in Employment Act (Counts V and VI)*

Mr. Collier claims that New Albany discriminated and retaliated against him in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* The ADEA prohibits employment discrimination against employees 40 years of age or older and prohibits employers from retaliating against employees for opposing an act made unlawful by the ADEA. 29 U.S.C. § 623(a), (d). New

Albany argues it's entitled to summary judgment on both of Mr. Collier's ADEA claims because he didn't timely file those claims with the EEOC. New Albany then argues that Mr. Collier's ADEA claims both fail on their merits.

A plaintiff claiming an ADEA violation must file a charge alleging the unlawful actions with the Equal Employment Opportunity Commission or state analog within 180 days of the alleged unlawful practice. 29 U.S.C. § 626(d). Filing a charge with the EEOC is a prerequisite to filing a claim in federal court. Babrocky v. Jewel Food Co., 773 F.2d 857, 863 (7th Cir. 1985). Mr. Collier first filed an EEOC charge alleging Title VII, ADA, and FMLA violations on June 10, 2020. [Doc. 48-29]. The charge made no mention of age. He amended his charge to include age discrimination in violation of the ADEA on September 18, 2020. [Doc. 48-30]. He alleged ADEA violations relating to his shift assignments from January 21, 2020, to March 12, 2020. New Albany argues that any ADEA claim is barred because 190 days passed between the alleged unlawful acts ending on March 12, 2020, and his amended charge in September.

Mr. Collier argues that his ADEA claims are timely, despite the 190 days that passed. He relies on Edelman v. Lynchburg College, 535 U.S. 106 (2002), which upheld an EEOC regulation "permitting an otherwise timely filer to verify a charge after the time for filing has expired." Id. at 109. According to Mr. Collier, his amended charge, which alleged ADEA violations for the first time, should be deemed timely because it amended an earlier and timely charge.

Mr. Collier's reads Edelman v. Lynchburg College too broadly. The Court in Edelman v. Lynchburg College only addressed circumstances when a claimant

26

files a charge on time but for one reason or another doesn't verify and sign the charge. The EEOC regulation that interpreted 29 U.S.C. § 626(d) allowed for a charge to be deemed timely if the only defect was lack of verification. The Court didn't announce a rule that *any* charge is deemed timely when addended to a timely charge; it upheld a rule that allowed the single step of verification to be deemed timely. Deeming Mr. Collier's ADEA claims as timely would go beyond what's allowed under Edelman v. Lynchburg College and the ADEA.

Even if the charge were timely, New Albany would be entitled to summary judgment. Mr. Collier only makes one argument against summary judgment on both claims: similarly situated employees who were younger than Mr. Collier weren't demoted from captain to sergeant or forced into lower paying positions like he was. Without identifying any specific coworkers, he seems to refer to Mr. Peters and Mr. Sullivan.

This isn't enough for a discrimination or retaliation claim. Mr. Collier can show discrimination by showing that similarly situated employers who were younger were treated better than him. *See* Carson v. Lake Cnty., 865 F.3d 526, 532–533 (7th Cir. 2017). Comparators needn't be identical in every conceivable way but must be directly comparable in all material respects. Coleman v. Donahoe, 667 F.3d 835, 846 (7th Cir. 2012). As New Albany shows, Mr. Collier was of a higher rank than Mr. Sullivan and Mr. Peters and New Albany held captains to higher standards. Mr. Collier doesn't explain or show that this difference is immaterial.

Mr. Collier's ADEA retaliation claim fares no better. ADEA retaliation claim requires evidence that would allow a reasonable jury to find that he engaged in statutorily protected activity and his employer retaliated against him because of that activity. Daza v. Indiana, 331 F. Supp. 3d 810, 848 (S.D. Ind. 2018). Mr. Collier doesn't identify a single action he took that was protected by the ADEA. For these reasons, New Albany is entitled to summary judgment on Mr. Collier's age discrimination and age retaliation claims.

*FMLA Retaliation (Count IV)*

Mr. Collier claims New Albany retaliated against him in violation of the Family and Medical Leave Act. The FMLA requires that employers allow employees to take medical leave for qualifying health reasons and prohibits employers from retaliating against employees who assert FMLA rights. Freelain v. Vill. of Oak Park, 888 F.3d 895, 900 (7th Cir. 2018). A plaintiff proves an FMLA retaliation by showing that: (1) the employee engaged in activity protected by the FMLA; (2) the employer took a materially adverse action against the employee; and (3) the protected activity caused the adverse action. Id. at 901 (citing Pagel v. TIN, Inc., 695 F.3d 622, 631 (7th Cir. 2012)). An employer's action is materially adverse if it would dissuade a reasonable employee from engaging in the protected activity, according to an objective standard, not the employee's subjective reaction. Id. at 901–902. The ultimate question is whether a reasonable jury could find that a retaliatory motive caused the adverse employment action. Grant v. Trs. of Ind. Univ., 870 F.3d 562, 569 (7th Cir. 2017).

28

New Albany argues that there's no genuine issue as to any act of retaliation. It argues that marking Mr. Collier as AWOL was a mistake promptly corrected, that no one in the fire department complained of or gossiped about Mr. Collier's FMLA leave, and that none of the gossip about Mr. Collier's hernia surgery was New Albany's doing.

Mr. Collier's response in opposition is brief. He contends that Sergeant Sparks marking him as AWOL when he was on FMLA leave and "Defendant shared the nature of Collier's FMLA leave with others working within his department." [Doc. 51 at 19]. He asserts that these facts are enough to support an FMLA retaliation claim.

The events on which Mr. Collier relies aren't enough to create a genuine issue as to retaliation. His FMLA leave caused the AWOL incident in the most superficial meaning of the phrase — if he hadn't been on FMLA leave, he wouldn't have been marked AWOL — but he hasn't provided evidence that it caused the AWOL incident in the legally significant meaning — whether Sergeant Sparks was motivated to mark Mr. Collier as AWOL in retaliation for his FMLA leave. New Albany shows evidence that the AWOL incident was a clerical mistake and Mr. Collier cites no evidence to contradict that explanation or otherwise impute retaliatory motive to Sergeant Sparks and Deputy Chief Gadd. His assertions about the hernia surgery fare no better. He asserts that New Albany is responsible for spreading that information around but cites no evidence to contradict New Albany's explanation offered around that time and offered now — that Ms. Hammond spoke too loudly and some firefighters overheard.

Evidence that a secretary spoke too loudly about a hernia surgery meant to remain a secret, without more, doesn't raise any inference of retaliation. Accordingly, New Albany is entitled to summary judgment on Mr. Collier's FMLA retaliation claim.

CONCLUSION

For the foregoing reasons, the court GRANTS the City of New Albany's motion for summary judgment [Doc. 46] as to each of Mr. Collier's claims and DIRECTS the clerk to enter judgment accordingly.

SO ORDERED.

ENTERED:   January 24, 2023

_____/s/ Robert L. Miller, Jr._____
Judge, United States District Court

Distribution to all counsel of record via CM/ECF.